W.W.W. PHARMACEUTICAL
CO., INC., Plaintiff,

v.

The GILLETTE COMPANY, Defendant.

No. 89 Civ. 1942 (CBM).

United States District Court,
S.D. New York.

May 21, 1992.

Opinion on Plaintiff's Motion to Amend
Judgment July 14, 1992.

John M. Keene, Graham, Campaign & McCarthy, P.C., New York City, for plaintiff.

Marie V. Driscoll, Robin, Blecker, Daley & Driscoll, New York City, for defendant.

## OPINION ON MOTION FOR JUDGMENT AS A MATTER OF LAW AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, District Judge.

Plaintiff commenced this action on March 21, 1989, claiming that defendant's unauthorized use of the terms SPORT and STICK in the packaging and marketing of its Right Guard deodorant and anti-perspirant products has injured plaintiff's federally registered trademark SPORTSTICK for lip balm. Plaintiff alleges four causes of action: Count 1, for infringement of a registered trademark under § 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a); Count 2, for false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); Count 3, for trademark infringement and unfair competition under New York state law; and Count 4, for violation of New York's anti-dilution statute, § 368–d of the General Business Law of the State of New York. The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332, 1338 and 15 U.S.C. § 1121. Plaintiff demanded trial by jury on all issues and requested injunctive relief, monetary damages, and attorney's fees.

At the close of discovery, defendant moved for summary judgment on the grounds that defendant's use of the mark was a "fair use" as a matter of law. Judge Kenneth Conboy denied the motion by opinion dated December 5, 1989. The case was transferred to this court in October of 1991. The court held several pre-trial conferences for the purpose of narrowing the issues at trial and ruling on several motions in limine. The court's rulings on these motions are set forth in a Pre-trial Schedule and Order dated December 16, 1991. In this order, the court ruled that the trial would be bifurcated, with liability to be tried first, followed by trial on the issue of damages should plaintiff prevail on the issue of liability.

The liability stage of the trial commenced January 2, 1992. Plaintiff completed its case on January 7, 1992, at which time defendant moved to dismiss plaintiff's damages claim for failure to prove real and precise actual confusion, to dismiss plaintiff's complaint in its entirety for failure to establish liability as a matter of law, and for Judgment as a Matter of Law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. The court heard oral argument and granted the motion with respect to plaintiff's damages claim and reserved decision on the issue of liability for injunctive relief. The court then dismissed the jury, there being no issues of fact remaining for

the jury to determine. The court now makes the following findings of fact and conclusions of law.

## FACTS

### I. *Plaintiff's Use of SPORTSTICK*

Plaintiff, a New York corporation, has been engaged in the business of selling lip balm since 1982. (PX 55) Plaintiff's lip balm is identified by the registered trademark SPORTSTICK. (Tr. 291) SPORTSTICK lip balm is sold through plaintiff's SPORTSTICK division, and is the only product plaintiff sells. (PTO 20) Plaintiff's founder, Steven Pliss, is also the president, sole shareholder, and sole employee of the company. (Tr. 3–4)

The SPORTSTICK lip balm business was originally established by Rumby International, Inc. (hereinafter "Rumby") in 1978. Rumby applied to register the trademark SPORTSTICK for use on and in connection with "lip pomade," and on May 11, 1982, was issued Certificate of Registration No. 1,194,944. In 1981, plaintiff purchased from Rumby all rights, title and interest in the trademark SPORTSTICK and the formula for lip balm sold under that trademark for $10,000. (Tr. 13; PX 1) At the time plaintiff purchased SPORTSTICK, it was being marketed exclusively in hotel gift shops. (Tr. 13) Mr. Pliss had no experience in marketing lip balm at the time plaintiff purchased SPORTSTICK. (Tr. 115)

Affidavits of use and incontestability were filed in support of plaintiff's registration of SPORTSTICK, and were accepted by the United States Patent and Trademark Office in January of 1989. (Tr. 291) Defendant has not challenged the validity and incontestability of plaintiff's registration of SPORTSTICK. There are no other federal trademark registrations for SPORTSTICK, or for SPORT STICK.

Plaintiff has continued to market and promote SPORTSTICK lip balm since 1982. (PTO 5) Plaintiff has used essentially the same trade dress in marketing SPORTSTICK, that is, a 2⅝ inch long, ⅝ inch in circumference, royal blue-colored cylindrical tube and cap, with the mark SPORTSTICK prominently displayed on the tube in white lettering. (PX 4(e)) Plaintiff has used several different forms of external packaging in an effort to make SPORTSTICK more attractive to retailers, including two different types of hangstrips, point-of-sale displays known as "shoe boxes," and smaller display boxes. Plaintiff made modifications updating each of these packaging forms several times between 1982 and 1986. (Tr. 15) Plaintiff implemented the following product changes in the mid–1980s: plaintiff added three additional "flavors" of SPORTSTICK, sealed the tops of individual SPORTSTICKS, and added a UPC label to each product container. (Tr. 16; PX 4(e)1)

Plaintiff's SPORTSTICK is sold either from store aisle shelves, at check-out counters or in point-of-sale displays in retail outlets. (PTO 23–24) SPORTSTICK has been sold in pharmacies, supermarkets, mass marketing chains, convenience stores, and college bookstores. (PTO 23) At the greatest point in plaintiff's national sales, plaintiff had a total of seventy-five different sales accounts and sold SPORTSTICK in approximately 8,000 stores, including major national chains such as Safeway, Lucky Stores, Smith Stores, Arco, and Eckerd Drugstores. (Tr. 36–37) Plaintiff has sold SPORTSTICK in approximately forty states. (Tr. 37) Most of plaintiff's efforts to sell SPORTSTICK consisted of personal sales promotion trips and visits to stores by Mr. Pliss. (Tr. 31–32, 36) Mr. Pliss also participated in trade shows and used promotions combining sales of SPORTSTICK with give-away items such as caps, hats, rulers and cameras. (Tr. 17–19, 21–23; PX 7(a)–(p)) The standard retail price for SPORTSTICK is two dollars each, although it is sometimes sold for less. (PTO 19; Tr. 78)

Plaintiff engaged in modest advertising of SPORTSTICK from 1982 through the first quarter of 1988. In 1984, plaintiff had two thirty-second spot local television commercials produced. The commercials were broadcast in various local television markets from 1984 through the first quarter of 1988. (Tr. 20, 140; PX 8(1), 8(2))

Plaintiff has also advertised SPORTSTICK on local radio spots aired on approximately six local stations in mid-Atlantic cities and on state radio networks in six states. (Tr. 24–26) Plaintiff has also placed print advertisements for SPORTSTICK in college newspapers, trade papers, several local newspapers, two metropolitan editions of TV Guide, and several magazines targeting new mothers. (Tr. 26–31; PX 5(a)–(*l*)) Plaintiff's advertising slogan describes SPORTSTICK as a product "for sportspeople and lovers". (PX 4(a)–(e), 8(1)-(3)) Plaintiff's advertising expenses for fiscal years 1982 through 1990 totaled approximately $252,000. (PTO 23)

The annual gross sales of SPORTSTICK for fiscal years 1982 through 1990 were as follows:

| | |
|---|---|
| 1982: | $ 56,714.52 |
| 1983: | 42,779.00 |
| 1984: | 171,390.00 |
| 1985: | 233,267.00 |
| 1986: | 59,893.00 |
| 1987: | 46,030.00 |
| 1988: | 30,345.00 |
| 1989: | 11,229.00 |
| 1990: | 14,756.00 |

(PTO 22) After plaintiff purchased SPORTSTICK in 1982, gross sales of SPORTSTICK increased, peaking at $233,267 in fiscal year 1985. In the period of 1986–1987, plaintiff decided to change suppliers and began employing a supplier in Silver City, New Mexico, in an effort to reduce production costs. (Tr. 37–38) The new supplier was unable to produce sufficient quantities of SPORTSTICK, however, and as a result, plaintiff lost most of its accounts and sustained a dramatic decrease in sales. (Tr. 37–38, 40) Major accounts lost during this period include Thrift Drug Stores, Revco Drug Stores, Eckerd, Safeway and Rite–Aid. (Tr. 37, 40, 122–24) Plaintiff's loss of sales during this period is admittedly unrelated to any conduct on the part of defendant. (Tr. 121, 340–41)

In late 1987, plaintiff again changed suppliers in an effort to re-establish its ability to supply SPORTSTICK to its customers. (Tr. 42, 121) Plaintiff began to experience an increase in sales during the first quarter of 1988. (Tr. 121) However, plaintiff's sales again declined at an increasing rate after the first quarter of 1988, and gross sales of SPORTSTICK for fiscal year 1989 totaled $11,229. As of January 3, 1992, gross sales of SPORTSTICK for fiscal year 1991, ending April 30, 1992, totaled approximately $78,000. (Tr. 92) From 1987 to the present, Mr. Pliss has made personal loans to plaintiff in the amount of approximately $224,000. (Tr. 93) Plaintiff's gross sales in the state of New York for the years 1984 through 1988 totaled $490, with sales to only four customers. (PTO 22)

## II. *Defendant's Use of SPORT STICK*

Defendant is a Delaware corporation engaged in the business of selling a variety of personal care products, including razors and blades, shaving cream, deodorants and anti-perspirants, and other toiletries. (PTO 5) Defendant has sold personal deodorants under the RIGHT GUARD brand since 1959, and the parties have stipulated that the brand is well known. (PTO 24) In addition to RIGHT GUARD, defendant has marketed two separate and distinct lines of anti-perspirants and deodorants since 1986, one bearing the trademark SOFT & DRI, the other DRY IDEA. The oval anti-perspirant form of each of these lines is referred to on its packaging as a "solid". (PX 10(27–28))

Despite RIGHT GUARD's name recognition, RIGHT GUARD had, in the early and mid–1980s, experienced a decline in sales and a steady erosion of its marketshare due to consumer perception that RIGHT GUARD was mainly a product for older men and due to the fact that the product was primarily available in the increasingly unpopular aerosol spray form. (Tr. 221–211, 228) In late 1986 or early 1987, defendant's marketing executives decided to launch a new "sport" line of RIGHT GUARD products under the trademark SPORT SCENT, in an effort to appeal to a more youthful market. (Tr. 244; PTO 24) Defendant's decision to use the term "sport" on the line extension was based on the attractive life-style connotations of the word "sport" and the experience of an affiliate of defendant that had already successfully launched a RIGHT GUARD sport

line in the United Kingdom. (Tr. 210–211; PTO 24)

At the time of the decision to launch the sport line extension, the RIGHT GUARD line consisted of: 1) an aerosol deodorant in "original scent"; 2) an aerosol anti-perspirant in three "flavors"; 3) a round deodorant "stick" in three flavors; 4) a round anti-perspirant "solid" in two flavors; and 5) a roll-on in two flavors. (PX 9(b), p. 0644; PX 10(26)) Throughout the period of late 1986 through March of 1987, defendant's internal correspondence regarding the proposed sport line of RIGHT GUARD products used the term "solid" to refer to RIGHT GUARD anti-perspirants, and the term "stick" to refer to RIGHT GUARD deodorants. (PX 51; PX 9(a), p. 6; PX 9(b), pp. 0643–45) During the period of late 1986 through early 1987, defendant envisioned the product to be launched under the new RIGHT GUARD sport line as RIGHT GUARD SPORT SCENT. (PX 9(a), p. 3; PX 51)

In early April of 1987, the advertising agency N.W. Ayer conducted, at defendant's request, four exploratory focus group surveys in Atlanta, Georgia. The surveys questioned male users of deodorants and anti-perspirants on their reaction to the terms RIGHT GUARD and SPORT STICK. The results of the focus group studies were made available to defendant in summary form by mid-April of 1987. (PX 9(c)) The results were reported more extensively in a document completed in May of 1987, titled GILLETTE RIGHT GUARD PROJECT "SPORT STICKS" EXPLORATORY FOCUS GROUPS. (PX 9(e)) The document reported a very negative reaction to the brand name RIGHT GUARD and an extremely positive reaction to the name SPORT STICK. (PX 9(e), pp. 3–4) The study also showed that "stick" was the term most commonly used by consumers to refer both to deodorants and anti-perspirants, and that the product should be referred to as a "stick" instead of a "solid". (PX 9(e), pp. 3, 5–6)

The details of the sport line extension project were set forth in a document written sometime after March of 1987, titled RIGHT GUARD BUSINESS PLANS. (PX 9(h); Tr. 246) This document predicted further erosion in RIGHT GUARD's share of the stick/solid sub-segment of the anti-perspirant/deodorant market, and recognized the considerable market-share advantage enjoyed by a product of a competitor company, the Mennen Company's SPEED STICK. The "Marketing Plan" section of the 1988 RIGHT GUARD BUSINESS PLAN employed the terms SPORT STICK, rather than SPORT SCENT, to identify deodorants and anti-perspirants in the new RIGHT GUARD sport line. (PX 9(h))

Defendant knew of plaintiff's registration of the trademark SPORTSTICK for lip balm prior to its decision to use SPORT and STICK on the packaging of its RIGHT GUARD products and prior to its first commercial use of SPORT STICK. (PX 45) Before defendant launched the sport line of RIGHT GUARD products, defendant's in-house trademark attorney had trademark searches performed for the terms SPORT and GS SPORTSLINE. (PTO 12; PX 12(a)-(b)) These searches revealed over sixty trademarks incorporating the term SPORT, including plaintiff's federal registration of the trademark SPORTSTICK for lip balm, as well as two registrations in the name of Jovan, Inc., for the trademark SPORT SCENT for a variety of personal care products, including deodorants.

Defendant launched a sport line of RIGHT GUARD products in 1988. The sport line includes deodorants and anti-perspirants sold in both aerosol and stick forms. On the stick forms of the product, the words SPORT and STICK appear on the front labeling below the RIGHT GUARD brand, and are printed in smaller letters than the words RIGHT GUARD. (PX 10) A design of a running stick figure separates the words SPORT and STICK on the front labeling of the product. (PX 10) On back labels, the words SPORT and STICK appear to the right of the RIGHT GUARD brand name, and are also in smaller print. (PX 10) RIGHT GUARD SPORT STICK is sold for approximately $2.00 in retail stores. (PTO 19)

Defendant began advertising RIGHT GUARD's sport line in May of 1988. Defendant's advertising has consistently emphasized a sports theme. (PX 54(a)-(c); PTO 14) Defendant has advertised RIGHT GUARD SPORT STICK's on television commercials featuring professional sports stars such as Marvin Hagler, Charles Barkley, Brian Bosworth, Kirk Gibson, and Hulk Hogan as spokesmen. (PX 54(a)-(c); PTO 14) These commercials have been shown nationally on prime time programs such as Monday Night Football. (PTO 19) In all of the commercials, the words RIGHT GUARD immediately precede the words SPORT STICK or SPORT STICKS. RIGHT GUARD SPORT STICKS have also been advertised extensively in magazines and newspapers. The words RIGHT GUARD appear next to the words SPORT STICK or SPORT STICKS in the print advertisements as well. (PX 15) Although defendant has claimed that its advertising and promotional expenses for marketing its RIGHT GUARD "sport" line are confidential, the evidence submitted at trial and placed under seal shows that such expenditures are quite extensive. (Tr. 64–65)

Lip balms and anti-perspirants and deodorants are customarily sold through the same channels of trade, primarily drugstores, super-markets, convenience stores and college bookstores, and are sold generally to the same classes of retail purchasers. Defendant's RIGHT GUARD SPORT STICK is sometimes displayed on retail shelves near plaintiff's SPORTSTICK. (Tr. 76–78) However, deodorants and anti-perspirants are not generally shelved at checkout stands, where lip balms are frequently displayed. (Tr. 76; PTO 25) Although both lip balm products and anti-perspirant/deodorant products are personal care products that are topically applied, they are obviously different, non-competitive products used for different purposes. Plaintiff's SPORTSTICK and defendant's RIGHT GUARD SPORT STICK have coexisted in the marketplace since May of 1988.

Plaintiff protested defendant's use of SPORT STICK by letter dated May 12, 1988. (PX 41(a)) Defendant responded on May 26, 1988, but did not cease its use of the words. (PX 41(b)) Plaintiff commenced this action on March 21, 1989.

## DISCUSSION

Plaintiff brings federal law claims for trademark infringement and false designation of origin under the Lanham Act, 15 U.S.C. §§ 1114, and 1125(a), respectively, and state law claims for unfair competition under New York common law and dilution under § 368–d of New York General Business Law.

### I. *Plaintiff's Lanham Act Claims*

An action for false designation of origin under 15 U.S.C. § 1125(a) is broader than an action for trademark infringement under 15 U.S.C. § 1114, in that it encompasses other forms of misrepresentation in addition to the unauthorized use of trademarks.[1] Both actions require a plaintiff to prove a likelihood of confusion in order to establish liability.

Plaintiff's trademark and unfair competition claims center on the allegation that defendant's use of SPORT STICK caused plaintiff's potential customers to mistakenly believe either that defendant is the source of plaintiff's SPORTSTICK or that plaintiff is the actual infringer, resulting in injury to plaintiff's sales and/or reputation. The present case differs from the typical

---

**1.** 15 U.S.C. § 1125(a) provides in relevant part:
"(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending to falsely describe or represent the same ... shall be liable to a civil action by ... any person who believes that he is or is likely to be damaged by the use of any false description or representation."

15 U.S.C. § 1114 provides in pertinent part:
"1) Any person who shall, without the consent of the registrant, (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant for the remedies hereinafter provided."

"passing off" case in that plaintiff is claiming "reverse confusion." In a reverse confusion case, prospective purchasers are led to mistakenly believe that the plaintiff's goods are produced by the defendant. *Lang v. Retirement Living Pub. Co., Inc.,* 949 F.2d 576, 583 (2d Cir.1991). The Second Circuit has explicitly held that a plaintiff may bring an action alleging reverse confusion, defined as the misimpression that the junior user is the source of the senior user's goods, under the Lanham Act. *Banff, Ltd. v. Federated Dept. Stores, Inc.,* 841 F.2d 486, 490 (2d Cir.1988). Explaining the harm caused by reverse confusion, the *Banff* court stated:

"... consumers initially aware of [the defendant's product] may believe that [the plaintiff's] mark they later encounter originates with [the defendant]. These consumers may consider [the plaintiff to be] an unauthorized infringer, and [the defendant's] use of the mark may in that way injure [the plaintiff's] reputation and impair its good will." *Id.* at 490.

The Second Circuit implicitly recognized an action for reverse confusion in cases involving non-competing products in *Plus Products v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1004 (2d Cir.1983).

A. Plaintiff's Damages Claims

■ Plaintiff is entitled to a monetary award on its Lanham Act claims only to the extent that injury is shown already to have been suffered. *Monsanto Chemical Co. v. Perfect Fit Products Manufacturing Co.,* 349 F.2d 389, 392 (2d Cir.1965), *cert. denied,* 383 U.S. 942, 86 S.Ct. 1195, 16 L.Ed.2d 206 (1966). The Second Circuit requires proof of real and precise actual consumer confusion in order to recover damages under the Lanham Act. *Coach Leatherware Co. v. AnnTaylor, Inc.,* 933 F.2d 162 (2d Cir.1991); *Getty Petroleum Corp. v. Island Transportation Corp.,* 878 F.2d 650 (2d Cir.1989); *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.,* 818 F.2d 266 (2d Cir.1987); *Shen Mfg. Co. v. Suncrest Mills, Inc.,* 673 F.Supp. 1199 (S.D.N.Y.1987). Cases claiming reverse confusion are no exception to this require-

ment. *See, e.g., Mastercard International, Inc. v. Arbel Corp.,* 13 U.S.P.Q.2d (BNA) 1958, 1989 WL 125781 (S.D.N.Y. 1989) (denying summary judgment for the defendant in a reverse confusion case on the issue of damages based on an affidavit of the President of plaintiff's company showing that actual reverse confusion damaged the plaintiff's reputation).

■ The relevant confusion is confusion that affects the purchasing decisions of actual or prospective purchasers of the plaintiff's product. *Lang,* 949 F.2d at 582–83; *Beneficial Corp. v. Beneficial Capital Corp.,* 529 F.Supp. 445, 450 (S.D.N.Y.1982); *Programmed Tax Systems, Inc. v. Raytheon Co.,* 439 F.Supp. 1128, 1132 (S.D.N.Y.1977). The prospective purchasers may be consumers, retailers or wholesalers. *Lon Tai Shing Co. v. Koch & Lowy,* 19 U.S.P.Q.2d (BNA) 1081, 1990, 1991 WL 170734 (S.D.N.Y.1991); *Russ Berrie & Co. v. Jerry Elsner Co.,* 482 F.Supp. 980, 990 (S.D.N.Y.1980); McCarthy, 2 *Trademarks and Unfair Competition* 46 (2d ed. 1984). To establish actual confusion on a reverse confusion theory, plaintiff must prove that the retailers who otherwise would have purchased SPORTSTICK mistakenly believed that plaintiff's trademark originated with defendant and that plaintiff was an unauthorized infringer, resulting in lost sales or harm to plaintiff's reputation. *Lobo Enterprises, Inc. v. Tunnel, Inc.,* 693 F.Supp. 71, 77 (S.D.N.Y. 1988).

Plaintiff's proffered evidence of actual confusion falls far short of the proof required for damages in this Circuit. Plaintiff's sole evidence of actual confusion is in the form of testimony from Mr. Pliss. Mr. Pliss testified that on one occasion, an unidentified person, subsequently described by plaintiff's attorney as a "friend", came into Mr. Pliss' office in New York and told Mr. Pliss that he had seen a SPORTSTICK commercial on television the previous night, although plaintiff was not advertising its product on television in New York at the time. (Tr. 43, 330) There is no indication that this person was a prospective purchaser of SPORTSTICK or that the

so-called confusion affected in any way the purchasing and selling of SPORTSTICK. The most that can be said of this incident is that Mr. Pliss was confused upon hearing that SPORTSTICK was being advertised on television. A second alleged incident occurred when Mr. Pliss called a prospective account in Michigan and was told by a Mr. Miller, "I thought you were from Gillette." (Tr. 43–44) Mr. Miller nevertheless agreed to meet with Mr. Pliss to discuss SPORTSTICK, and there is absolutely no indication that Mr. Miller would have otherwise purchased SPORTSTICK were it not for his initial confusion as to Mr. Pliss' affiliation. In fact, Mr. Miller's statement could be interpreted as a mere expression of disappointment upon discovering that Mr. Pliss represented W.W.W. instead of Gillette. On another occasion, Mr. Pliss testified that a New York retailer repeatedly refused to grant him appointments to discuss SPORTSTICK. (Tr. 81) However, the testimony did not establish a relationship between these refusals and any confusion stemming from defendant's use of SPORT STICK. In the only testimony attempting to link a decline in SPORTSTICK sales to Gillette's alleged infringement, Mr. Pliss testified that Pathmark's refusal to purchase plaintiff's SPORTSTICK was related to the fact that Pathmark advertised Gillette's SPORT STICK'S. (Tr. 49) However, Mr. Pliss gave no factual basis from which the court could infer such a relationship, and Mr. Pliss admitted that Pathmark never explained its refusal to purchase SPORTSTICK, adding that "[b]uyers never tell you why." (Tr. 49–50)

The court does not consider Mr. Pliss' speculation as to the reasons underlying a refusal to purchase SPORTSTICK to be evidence of real and precise actual confusion. The retailers' decisions not to purchase SPORTSTICK could just as easily have been based on plaintiff's past failure to supply its product as on any conduct on the part of defendant. The court concludes that plaintiff has offered no evidence of actual confusion by prospective purchasers as to the source of plaintiff's product that caused commercial injury to plaintiff in the form of declining sales, loss of good will, or harm to reputation.

Plaintiff's reliance on *Zazu Designs v. L'Oreal S.A.*, 9 U.S.P.Q.2d 1972 (N.D.Ill. 1988) to support its claim for damages is misplaced. In *Zazu Designs*, the court awarded damages to the plaintiff for a number of reasons not present in this case. In that case, the defendant's hair product was markedly inferior to the plaintiff's line of hair products, and the widely publicized failure of the defendant's product destroyed any value in the plaintiff's mark. Moreover, in that case, the court specifically noted instances of proven actual confusion. *Id.* at 1974, 1978. In the present case, no evidence of actual confusion has been presented, and there is no indication that plaintiff's reputation has been harmed in any way by defendant's use of the terms SPORT STICK. Plaintiff's claim for damages under the Lanham Act is dismissed.

### B. Plaintiff's Equitable Claims

Having disposed of plaintiff's claims for damages, the court now turns to the issue of liability for equitable relief under the Lanham Act. To establish liability for both false designation of origin, 15 U.S.C. § 1125(a), and federal trademark infringement, 15 U.S.C. § 1114, plaintiff must prove likelihood of confusion, that is, "that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1130 (2d Cir.1979) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)); *Invicta Plastics (USA) Ltd. v. Mego Corp.*, 523 F.Supp. 619 (S.D.N.Y.1981). Courts in this Circuit evaluate likelihood of confusion based on the factors set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). The *Polaroid* test analyzes the following factors: (1) the strength of the prior owner's mark, (2) the similarity between the two marks, (3) the proximity of the products, (4) the likelihood

that the prior user will bridge the gap, (5) actual confusion, (6) the defendant's good faith in adopting its mark, (7) the quality of the defendant's product, and (8) the sophistication of the buyers. No single factor is conclusive in this analysis and courts should weigh each factor in light of the totality of the evidence. *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1004 (2d Cir.1983).

### The Strength of the Mark

■ This factor concerns "the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular ... source." *McGregor–Doniger*, 599 F.2d at 1131. The strength of the mark turns on its " 'origin-indicating' quality, in the eyes of the purchasing public." *Id.* Two key factors to this determination are: 1) the degree to which it is inherently distinctive; and 2) the degree to which it is distinctive in the marketplace. *Cullman Ventures, Inc. v. Columbian Art Works, Inc.*, 717 F.Supp. 96 (S.D.N.Y.1989).

The inherent strength of a mark may be gauged by categorizing the mark as either generic, descriptive, suggestive, or arbitrary/fanciful. A mark is generic when it refers to a genus of which a particular product is a species. A generic mark receives no protection under the Lanham Act. A descriptive mark describes a product's features, qualities or ingredients in ordinary language, and may be protected if secondary meaning is established. A suggestive mark employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use "imagination, thought and perception to reach a conclusion as to the nature of the goods." *Thompson Medical Co. v. Pfizer, Inc.*, 753 F.2d 208, 213 (2d Cir.1985) (quoting *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968)). The essence of a suggestive mark is the use of a name in a creative way to suggest the nature or function of a product and its source. Suggestive marks are protected even if secondary meaning is not established. *Thompson Medical Co.*, 753 F.2d

at 216; *Shen Mfg. Co. v. Suncrest Mills, Inc.*, 673 F.Supp. 1199 (S.D.N.Y.1987). Fanciful, or arbitrary marks are invented solely for trademark usage and are afforded the greatest protection.

"Sport" is a very general word, often used in connection with personal care products to convey youthfulness or compatibility with a sporty lifestyle. "Stick" is a generic word commonly used to identify the form of a solid deodorant or anti-perspirant. (Tr. 174; DX C) Webster's Third New International Dictionary lists "stick deodorant" as an example of common usage of the word "stick". (DX B, C) In addition to this use, "stick" may also be used generically to refer to the roll-up tubular form in which lipstick is typically sold. (PTO 25; DX C) Plaintiff's lip balm is packaged in a shape similar to that of lipstick. (Tr. 132) However, in evaluating the strength of the mark, SPORTSTICK must be viewed as a composite term, rather than as the sum total of the two very general words, "sport" and "stick". *Banff*, 841 F.2d at 491. Although "sport" and "stick" are both generic or descriptive terms when viewed individually, the composite term SPORTSTICK is stronger than the sum of these two components.

Keeping in mind that it is often difficult to apply the fine distinctions separating these categories, the court finds SPORTSTICK to be a suggestive mark. SPORTSTICK is not so inherently distinct and unusual to be fanciful, nor does it sufficiently evoke the characteristics of the product to be descriptive. The consolidation of "sport" and "stick" in a single word suggests both the product's form and usage, but requires some imagination to surmise the nature of the product. This is the essence of a suggestive mark.

■ The categorization of a mark is highly relevant to its overall strength but is not alone controlling. *Centaur Communications, Ltd. v. A/S/M/ Communications, Inc.*, 830 F.2d 1217 (2d Cir.1987); *Plus Products*, 722 F.2d at 1005. Rather, the strength of the mark must be evaluated in light of its commercial context. *McGregor–Doniger*, 599 F.2d at 1133. A

plaintiff's success in the marketplace is a relevant consideration to this inquiry. Plaintiff has marketed SPORTSTICK since 1982 and has experienced only modest success in the lip balm market. Plaintiff has advertised SPORTSTICK primarily in local or regional markets. Plaintiff's relatively low national sales subsequent to its supply failures in 1985–1986 indicate that SPORTSTICK is not widely associated in the public's mind with plaintiff's product. *Lang*, 949 F.2d at 581. Extensive third-party use of a plaintiff's trademark in the marketplace is also relevant to a mark's distinctiveness in the marketplace. *Id.* Defendant documents extensive third party use of the individual words "sport" and "stick" on personal care products, including over sixty uses of the word "sport", although only plaintiff uses the mark SPORTSTICK. The court concludes that plaintiff's trademark is not highly distinctive in the marketplace.

The court finds plaintiff's SPORTSTICK mark to be only moderately strong, deserving of trademark protection, but not entitled to the fullest protection available under the law.

### The Similarity of the Marks

This factor pertains to whether the similarity of the marks is likely to cause confusion among prospective purchasers. *McGregor–Doniger*, 599 F.2d at 1133. This evaluation requires the court to examine the total impression created by the marks, including all factors that potential purchasers are likely to remember. This factor weighs in favor of plaintiff. SPORTSTICK and SPORT STICK are identical in sound, and defendant's use of SPORT STICK in its television advertisements is indistinguishable from the single word SPORTSTICK. However, several other factors undermine plaintiff's claim of absolute similarity between the marks. First, plaintiff's SPORTSTICK appears on plaintiff's packaging as one word, and is used as the sole identifier for the product. Defendants product, however, separates the words SPORT and STICK on the front label of the packaging with a design logo depicting a person running. Second, the terms SPORT and STICK are preceded on the defendant's package label by the words RIGHT GUARD, a widely recognized brand name identifying the product as emanating from defendant. Defendant's oral use of the mark in its television commercials is also immediately preceded by the RIGHT GUARD name. Where a similar mark is used in conjunction with a company name, the likelihood of confusion is lessened. *McGregor–Doniger*, 599 F.2d at 1134. In addition, the words SPORT and STICK on defendant's packaging are approximately one-third the size of the RIGHT GUARD mark and are the same size as the word "deodorant" or "deodorant anti-perspirant". The words SPORT and STICK appear smaller than the words RIGHT GUARD in most of Defendant's advertising as well. The obvious differences between the products themselves further lessen the likelihood that consumers will assume that plaintiff's product originates with defendant. While these factors do not prevent the court from finding that the marks are similar, they are nevertheless relevant to the weight assigned to this factor in the ultimate assessment of the likelihood of confusion.

### The Proximity of the Products

This factor looks to whether the two products compete with each other. *Lang*, 949 F.2d at 582. The use of similar designations is more likely to cause confusion where the goods serve the same purpose, fall within the same class of items, or are used together. *Id.* In assessing the proximity of the products, a court should examine the differences in the products' content, style, geographic distribution, market position and audience appeal. *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14 (2d Cir.1985). Under these criteria, this factor weighs strongly in favor of defendant. The products at issue here neither compete nor serve the same purpose. Although lip balm and deodorant may both be broadly categorized as personal care products, they are not competitive products and are used for entirely different purposes. Moreover, they differ in size, shape, and appearance. The vast differences between the products greatly reduce

the likelihood of consumer confusion. Under these circumstances, the fact that the products are sold primarily through the same channels of trade is of only minor significance, particularly when considered in light of the vast range of products typically sold in such general purpose stores. Where non-competitive goods are involved, greater proof is required under the *Polaroid* factors to establish likelihood of confusion. *Plus Products,* 722 F.2d at 1008–1009; *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.,* 411 F.2d 1097, 1100 (2d Cir.1969), *cert. dismissed,* 396 U.S. 1054, 90 S.Ct. 707, 24 L.Ed.2d 698 (1970).

### Bridging the Gap

This factor inquires into the likelihood that plaintiff will enter defendant's deodorant/anti-perspirant market. This factor reflects the fact that one interest protected by the law of trademarks and unfair competition is "the senior user's interest in being able to enter a related field at some future time." *Scarves by Vera, Inc. v. Todo Imports, Ltd.,* 544 F.2d 1167, 1172 (2d Cir.1976). The record shows that plaintiff has no intention of ever expanding his business to include the marketing of deodorants or anti-perspirants. Consequently, this factor also reduces any likelihood of confusion.

### Actual confusion

As discussed above, plaintiff has submitted no evidence of actual consumer confusion. Although actual confusion among potential customers may be difficult to document and is certainly not required for injunctive relief, the absence of evidence of actual confusion over a period of several years is "a strong indicator that the likelihood of confusion is minimal." *Plus Products,* 722 F.2d at 1006. The absence of any evidence of actual confusion in this case weighs in favor of defendant.

### Good Faith

This factor concerns the defendant's intent in adopting the mark and "looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang,* 949 F.2d at 583 (quoting

*Edison Brothers Stores, Inc. v. Cosmair, Inc.,* 651 F.Supp. 1547, 1560 (S.D.N.Y. 1987)). Facts establishing that the defendant selected a mark that reflects the product's characteristics, and that defendant requested a trademark search and relied on the advice of counsel, support a finding of good faith. *Id.*

Defendant's choice of SPORT STICK reflected its marketing decision to make RIGHT GUARD a "sportier" product and to emphasize the "stick" form of its deodorants and anti-perspirants. The term "sport" indicates the capacity of the product to minimize odor and perspiration of persons who participate in sports or have active lifestyles, and the term "stick" signifies the form of the product. Defendant's selection of SPORT STICK clearly reflects characteristics of its new RIGHT GUARD products.

Defendant conducted a trademark search prior to its launch of the product, which identified plaintiff's registered trademark SPORTSTICK. A defendant's use of a mark with prior knowledge of the plaintiff's registration of a very similar trademark does not necessarily create an inference of bad faith. *Lang,* 949 F.2d at 583–84; *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 48 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). Rather, the relevant intent in a likelihood of confusion inquiry is whether the defendant adopted a mark with the intent of promoting confusion and appropriating the prior user's good will. The improbability that defendant chose SPORT STICK for the purpose of capitalizing on plaintiff's reputation suggests that defendant did not act in bad faith in its use of SPORT STICK. *Lang,* 949 F.2d at 584; *Triumph Hosiery Mills, Inc. v. Triumph International, Corp.,* 308 F.2d 196, 199 (2d Cir.1962) ("an 'innocent' or a bona fide junior user ... [is] one, we think, whose use is not attributable to intent to obtain a free ride on the reputation of the owner of the trade-mark."). Moreover, any inference of bad faith from defendant's knowledge of plaintiff's trademark is further undermined by the fact that plaintiff's registration was

for use of SPORTSTICK only in connection with lip balm. *H. Lubovsky, Inc. v. Esprit de Corp.*, 627 F.Supp. 483, 490 (S.D.N.Y. 1986).

Consequently, the Court finds that defendant did not act in bad faith in its usage of SPORT and STICK on its RIGHT GUARD products, and this factor does not support plaintiff's claim of likelihood of confusion.

### Quality of Defendant's Product

This factor reflects the plaintiff's interest in avoiding injury to reputation that would result if the consuming public began to associate the plaintiff's products with lower quality products put forth by the defendant. Plaintiff does not allege that defendant's products are inferior in quality, and defendant's success in the marketplace would discredit such a conclusion. *Lever Brothers Co. v. American Bakeries, Co.*, 693 F.2d 251, 258 (2d Cir.1982). Consideration of the quality of defendant's product therefore weighs in favor of defendant. However, the court acknowledges that this factor alone does not prevent plaintiff from prevailing, as a junior user may be liable for infringement or unfair competition even if his goods are of a high quality. *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259–260 (2d Cir.1987).

### Sophistication of the Buyers

The final factor in the *Polaroid* analysis examines the sophistication of the potential purchasers of the plaintiff's product in the relevant market. Sophisticated consumers are generally expected to exercise greater care in making purchasing decisions and are therefore less likely to be confused as to the product's source. Plaintiff has proferred no evidence as to the sophistication of the consumers of plaintiff's product. However, because plaintiff's lip balm costs approximately $2.00, the consumers of plaintiff's product are generally viewed as casual purchasers who devote minimal time and energy in deciding whether to purchase such items. *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir.1979); *Shen Mfg. Co. v. Suncrest Mills Inc.*, 673 F.Supp. 1199 (S.D.N.Y.1987).

However, the thrust of plaintiff's case is that retailers were likely to mistakenly view plaintiff's product as emanating from defendant and assume that plaintiff is an unauthorized infringer, thereby harming plaintiff's ability to sell its product to retailers. Retailers are viewed as sophisticated buyers and are generally held to a higher standard of care in making purchasing decisions. *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 626 (2d Cir. 1983); *Laureyssens v. Idea Group, Inc.*, 768 F.Supp. 1036, 1049 (S.D.N.Y.1991); *Satinine, s.n.c. di Usellini & Co. v. Les Parfums de Dana, Inc.*, No. 83 Civ. 1697, slip opinion (S.D.N.Y. August 31, 1984). This factor therefore reduces the likelihood of confusion at the retail level. As to the likelihood of confusion on the part of general consumers who purchase lip balm in the stores, the factors discussed above, such as the dissimilarity of the products, minimize any confusion that is likely to result from defendant's use of the words SPORT STICK on its deodorant and antiperspirant products.

After considering the above factors and weighing each factor in light of the totality of the court's findings, the court concludes that plaintiff has failed to establish likelihood of confusion as required to establish liability for trademark infringement or unfair competition under the Lanham Act. The fact that this is a reverse confusion case does not alter the court's analysis. Although reverse confusion is clearly actionable under the law of trademarks and unfair competition, plaintiff's view of the reverse confusion doctrine is overly expansive. Plaintiff claims that the reverse confusion theory of liability prevents a larger, more successful defendant company from extensively promoting a similar mark in such a way that plaintiff's trademark is "swallowed-up, digested and destroyed for plaintiff's use". *Plaintiff's Proposed Findings of Fact and Conclusions of Law*, p. 35. However, where the parties are using similar marks on different products and where the balance of considerations ensures against a likelihood of confusion, the law does not give the plaintiff exclusive rights to usage of a particular trademark. As Judge Weinfeld has written, granting a

plaintiff an injunction under such circumstances "would be tantamount to awarding it exclusive dominion over the use of the word, and the right to impair other parties' entrance into areas of endeavor far removed from its own. The trademark laws were not designed to serve this purpose." *Information Clearing House, Inc. v. Find Magazine*, 492 F.Supp. 147, 163 (S.D.N.Y. 1980). Property rights in a trademark are limited to the trademark's use in connection with a business; they are not inherent ownership rights which are trampled upon every time a large company extensively advertises a similar mark to sell unrelated goods.

 Even if the court were to conclude that plaintiff had established a sufficient likelihood of confusion to succeed in its Lanham Act claims, the court could nevertheless conclude that injunctive relief is inappropriate. The *Polaroid* factors provide an analytical framework which courts in this Circuit must use as a basis for a likelihood of confusion inquiry, but these factors are not exhaustive. Other factors, including the equities involved in any award of injunctive relief, may also be considered. *McGregor–Doniger*, 599 F.2d at 1140 ("this Court has frequently supplemented its consideration of the *Polaroid* factors by balancing the conflicting interests of the parties involved"); *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 536 (2d Cir.1964) (considering, in addition to the *Polaroid* factors, the harm to the junior user as compared to the benefit to the senior user that would result from the requested injunction). Where a balancing of the equities indicates that an injunction would inflict grave harm on the defendant without substantially benefiting the plaintiff, injunctive relief is not warranted. *Mushroom Makers*, 580 F.2d at 49; *Lobo Enterprises, Inc. v. Tunnel, Inc.*, 693 F.Supp. 71, 79 n. 4 (S.D.N.Y.1988); *H. Lubovsky, Inc. v. Esprit de Corp.*, 627 F.Supp. 483 (S.D.N.Y. 1986).

In this case, a balancing of the equities weighs in favor of defendant. Plaintiff has been unable to re-establish SPORTSTICK as a valuable trademark after its failure to provide retailers with an adequate supply of its product. As a result of its past supply failures, plaintiff does not have significant good will in the trademark SPORTSTICK. On the other hand, an injunction prohibiting defendant's use of SPORT and STICK in the packaging and marketing of its RIGHT GUARD products would be highly detrimental to defendant. Defendant's investment in marketing and promoting RIGHT GUARD SPORT STICK has been substantial. Given the low likelihood of confusion, the absence of any risk that plaintiff's reputation would suffer from a mistaken assumption that its product originates with defendant, and the fact that any confusion resulting from defendant's use of SPORT STICK is not the type of confusion where a junior user profits from a senior user's reputation, the court finds that the balance of the equities favors the denial of plaintiff's request for injunction relief.

For the above reasons, the court concludes that plaintiff is not entitled to equitable relief on its federal law claims for trademark infringement and false designation of origin.

## II. *Plaintiff's State Law Claims*

### A. Unfair Competition

 The elements of an action for unfair competition under New York law are very similar to the elements of false designation of origin and trademark infringement under the Lanham Act. *Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 484 F.Supp. 643 (S.D.N.Y.1979), *aff'd in part, rev'd in part*, 618 F.2d 950 (2d Cir.1980). New York law of unfair competition also requires proof of actual confusion before monetary relief may be awarded. *Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 618 F.2d 950, 955 (2d Cir.1980); *Scarves by Vera, Inc. v. Todo Imports, Ltd.*, 544 F.2d 1167, 1175 (2d Cir.1976); *Lambda Electronics Corp. v. Lambda Technology, Inc.*, 515 F.Supp. 915, 931 (S.D.N.Y.1981). For the reasons discussed above, Plaintiff has failed to prove actual confusion as a matter of law. Plaintiff is therefore not entitled

to damages on its claim for unfair competition under New York law. New York law of unfair competition also requires proof of likelihood of confusion to establish liability. For the reasons discussed above, the facts of this case do not justify a finding of likelihood of confusion. Plaintiff has therefore failed to prove unfair competition under New York law.

## B. Plaintiff's Claim for Dilution

■ Plaintiff also seeks injunctive relief under New York's anti-dilution statute, General Business Law § 368–d.[2] Unlike plaintiff's other claims, this action does not require proof of likelihood of confusion to establish liability. The essence of a claim for dilution is that the defendant is attempting to "feed[ ] upon the business reputation of an established distinctive trademark or name." *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 545, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977). In order to warrant protection under this statute, the plaintiff's mark must be "a strong mark, one which has a distinctive quality or has acquired a secondary meaning which is capable of dilution." *Id.* at 546, 399 N.Y.S.2d 628, 369 N.E.2d 1162; *see also Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625–26 (2d Cir.1983) (interpreting the New York anti-dilution statute as affording protection to only extremely strong marks); *Sage Realty Corp. v. Sage Group, Inc.*, 711 F.Supp. 134, 143 (S.D.N.Y.1989) ("only the strongest, most well-established marks are protected by § 368–d against dilution"). Plaintiff has not shown that its mark possesses secondary meaning, and has failed to establish that SPORTSTICK is sufficiently distinctive under these standards to warrant protection under this statute.

In addition to the requirement that the plaintiff's mark possess a distinctive quality capable of dilution, plaintiff must also show a likelihood of dilution in order to obtain relief under the anti-dilution statute. *Mead Data Central, Inc. v. Toyota Motor Sales, Inc.*, 875 F.2d 1026, 1030 (2d Cir. 1989). Dilution requires some mental association between plaintiff's and defendant's marks. *Id.* at 1031. Because plaintiff's success in the marketplace has been limited, it is not clear that the general buying public is likely to associate the defendant's use of SPORT STICK on its deodorant and anti-perspirant products with plaintiff's use of SPORTSTICK on its lip balm. The absence of predatory intent on the part of defendant in using the words SPORT STICK also weakens plaintiff's claim for equitable relief under the anti-dilution statute. *Sally Gee*, 699 F.2d at 626.

For these reasons, plaintiff is not entitled to relief under § 368–d of New York General Business Law.

## III. Defendant's Request for Attorney's Fees and Sanctions

■ Defendant asks the court to award counsel fees incurred in defending against this action. Section 35 of the Federal Trademark Act, 15 U.S.C. § 1117, permits the court to award reasonable attorneys fees to the prevailing party only in "exceptional" cases. Those cases in which attorney's fees have been awarded to defendants under this provision have involved fraudulent, malicious or truly frivolous claims. *See, e.g., Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70 (2d Cir. 1986), *cert. denied*, 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986); *Diamond Supply Co. v. Prudential Paper Products Co.*, 589 F.Supp. 470 (S.D.N.Y.1984); *Mennen Co. v. Gillette Co.*, 565 F.Supp. 648 (S.D.N.Y.1983), *aff'd without op.*, 742 F.2d 1437 (2d Cir.1984). Although the court has found that plaintiff is not entitled to relief on its trademark claim, plaintiff's claim nevertheless does not rise to such a level as to warrant an award of attorneys fees un-

---

**2.** This statute provides:
 Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.
 N.Y.Gen.Bus.L. § 368–d (McKinney 1984). The statute provides for only equitable relief.

der 15 U.S.C. § 1117. Defendant's request for attorney's fees is denied.

In a letter to the court of December 19, 1991, defendant also requested sanctions against plaintiff's attorney for a material misrepresentation made in a document submitted to the court by plaintiff's attorney on December 4, 1991, and titled "Supplemental Memorandum in Opposition to Defendant's Motion in Limine to Strike Plaintiff's Theories of Damage and Supportive Expert Witness Testimony and Exhibits". In this document, which argued that plaintiff had sufficient evidence of actual confusion to prove damages and was therefore entitled to a jury trial, plaintiff's attorney represented to the court that one of plaintiff's witnesses would testify that in 1988, the Mennen Company considered purchasing plaintiff's SPORTSTICK trademark, but that Mennen's interest in the trademark evaporated when it learned of defendant's use of SPORT STICK. Plaintiff's attorney had previously represented in the original Pretrial Order signed on February 16, 1990, that the witness would testify that, sometime prior to 1988, the Mennen Company had considered using SPORT STICK as a trademark, but that such interest evaporated when it discovered plaintiff's registration of SPORTSTICK.

After reviewing the December 4, 1991 document in which plaintiff's attorney materially altered his description of the testimony that the witness would give, defendant objected to the unexpected change in the witness' testimony. In response, the court granted defendant leave to depose the witness in the court's Pretrial Schedule and Order of December 16, 1991. This deposition took place on December 18, 1991. In defendant's letter to the court of December 19, 1991, defendant's attorney stated that the witness had testified at the deposition that Mennen had looked into the possible purchase of plaintiff's business in 1985 or 1986, and had decided at the time, two years prior to defendant's use of SPORT STICK, that it was not the type of business that the company would be interested in purchasing. Defendant's attorney further stated in this letter that when she

showed the witness plaintiff's characterization of the witness' testimony from the December 4 document, the witness unequivocally denied the truth of plaintiff's statement.

On January 2, 1992, immediately preceding the trial, the court granted defendant's request to exclude the testimony of the witness and deferred decision on the issue of sanctions until the conclusion of the trial. At this time, after reviewing the relevant submissions, the court finds that under these circumstances defendant is entitled to recover the costs and reasonable counsel fees incurred in the taking of this witness' deposition. Although plaintiff's counsel, in a letter to the court of December 20, 1991, denies that he made any intentional material misrepresentations, the court finds that plaintiff's counsel's reliance on his recollection of a brief conversation with the witness over one year ago, without benefit of notes, does not constitute a "reasonable inquiry" into the veracity of the representations made to the court as required by Rule 11 of the Federal Rules of Civil Procedure. Rule 11 authorizes the court to impose sanction on an attorney who files a paper in violation of this rule, and such sanctions may include an order to pay to the other party the amount of the reasonable expenses incurred because the filing. Plaintiff's misrepresentation to the court in the December 4, 1992 document caused defendant to go to the unnecessary effort and expense of deposing a potential witness. Defendant is entitled to recover its reasonable expenses under Rule 11.

Defendant shall provide the court with an affidavit setting forth the reasonable legal fees and costs incurred in deposing the witness within ten days from the date of this opinion. Plaintiff shall have five days to submit a response, and the court shall set a date for a hearing to determine the reasonableness of the amount requested.

Defendant's motion for Judgment as a Matter of Law under F.R.C.P. 50(a) is granted. The clerk shall enter judgment for defendant on all counts. Defendant's

request for attorney's fees is denied, and defendant's request for sanctions is granted, in amount to be determined at a future date.

## MEMORANDUM OPINION ON PLAINTIFF'S MOTION TO AMEND THE JUDGMENT

Plaintiff has moved this court under Rule 59(e) of the Federal Rules of Civil Procedure to amend so much of the judgment as ordered that defendant is entitled, under Rule 11 of the Federal Rules of Civil Procedure, to recover the reasonable costs and attorney's fees incurred in taking the deposition of Peter O. Schundler on December 18, 1991. The relevant facts leading up to this motion are briefly set forth as follows.

By opinion dated May 21, 1992, and an accompanying order filed on that date, the court granted defendant's motion for judgment as a matter of law with respect to plaintiff's damage claim and entered findings of fact and conclusions of law with respect to plaintiff's equitable claims. At the same time, the court granted defendant's request for monetary sanctions under Rule 11 on the grounds that plaintiff's attorney materially misrepresented the substance of the future testimony of a potential witness, causing defendant to needlessly take that witness' deposition. The reasons for the court's imposition of sanctions are more fully set forth in the court's opinion of May 21, 1992.

By order of May 21, 1992, the court required the parties to appear on June 19, 1992 for a hearing to determine the reasonableness of the amount of sanctions to be awarded. Plaintiff filed a motion for reargument of that part of the order granting sanctions and a motion to amend the judgment under Rule 59(e). By order of June 12, 1992, the court granted plaintiff's request for a hearing on the issue of sanctions because there had been no prior hearing on the appropriateness of sanctions. After a hearing on June 19, 1992, the court now reaffirms its previous finding that plaintiff's attorney acted improperly in materially misrepresenting the substance of a prior conversation with the witness without a reasonable inquiry. Rule 11 imposes a duty on attorneys to conduct a reasonable inquiry to determine that papers signed and filed with the court are well grounded in fact, and requires the court to impose an appropriate sanction where an attorney fails to comply with this requirement. Plaintiff's attorney's misrepresentation in the instant case was central to his claim for damages. The substance of the witness' testimony was crucial to plaintiff's right to obtain a jury trial, and the importance of the testimony to plaintiff's case required plaintiff's attorney to exercise a high degree of care in describing how the witness would testify. Plaintiff's reliance on his memory of a conversation with the witness that took place much earlier as the basis for altering his description of how a key witness would testify was not reasonable under the circumstances.

In addition, local Rule 5 of the General Rules of the United States District Courts for the Southern and Eastern Districts of New York permits the court to impose sanctions for a party's failure to complete the necessary preparations for trial. Plaintiff's attorney's change in the description of how a key witness would testify on the eve of trial indicated a lack of trial preparation and caused defendant to take the witness' deposition at a time when all discovery was to have been completed. Under these circumstances, Rule 5(b) permits the court to exclude the testimony of Mr. Schundler and Rule 5(c) permits the court to assess reasonable costs against plaintiff's counsel.

However, having reaffirmed the appropriateness of sanctions, the court nevertheless agrees with plaintiff's attorney that the exclusion of the witness' testimony from plaintiff's case at trial was a sufficient sanction. After defendant brought to the court's attention plaintiff's counsel's misrepresentation of the witness' testimony, the court ruled from the bench that Mr. Schundler's testimony would be excluded from the trial. The court therefore finds that monetary sanctions are not warranted because the exclusion of the witness' testi-

**1030**

mony was an appropriate and sufficient sanction.

The court's prior order of May 21, 1992 is amended to strike that portion of the order awarding defendant reasonable costs and attorney's fees incurred in taking the deposition of Peter O. Schundler, and the judgment is amended to that extent.