Harland A. MACIA, III, d/b/a
Catamount Software,
Plaintiff,

v.

MICROSOFT CORPORATION, Intuit,
Inc., and Meca Software, LLC,
Defendants.

No. 2:00–CV–299.

United States District Court,
D. Vermont.

Sept. 17, 2004.

Marcus Brakhan, Esq., Burlington, VT, for Plaintiff.

John T. Brown, Esq., Chicago, IL, for Defendants.

## MEMORANDUM DECISION GRANTING DEFENDANT MICROSOFT'S MOTION FOR JUDGMENT ON PARTIAL FINDINGS

SESSIONS, Chief Judge.

In this action, Plaintiff Harland A. Macia, III, d/b/a Catamount Software ("Catamount") asserts claims of trademark infringement and unfair competition under federal and state law. At trial, Defendant Microsoft Corporation ("Microsoft") moved at the close of Catamount's evidence for a judgment on partial findings pursuant to Fed.R.Civ.P. 52(c).[1] For the reasons that follow, the motion is granted as to all

remaining counts of Catamount's Second Amended Complaint.

### Standard of Review

■ On a motion for judgment on partial findings, the trial judge, as the final fact finder, reviews all the evidence presented at the time of the motion without presumptions in favor of either party. *See, e.g., Regency Holdings (Cayman), Inc. v. The Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.)*, 216 B.R. 371, 374 (Bkrtcy.S.D.N.Y.1998) (collecting cases). The judge may grant the motion if, on the evidence presented, the judge would find against the party that has already presented evidence and in favor of the moving party. *See id.* If the court grants the motion, it must support its judgment with findings of fact and conclusions of law. Fed.R.Civ.P. 52(c).[2] The court's factual findings are subject to review under the clearly erroneous standard. *See, e.g., Geddes v. N.W. Mo. State Univ.*, 49 F.3d 426, 429 n. 7 (8th Cir.1995).

### Factual Findings

Catamount presented evidence at trial that was consistent with, and added very little to, the undisputed facts before the Court at summary judgment. Thus, a similar statement of facts can be found in the Court's prior order denying Microsoft's and Catamount's motions for summary judgment. *See* Op. & Order at 1–5 (Doc. 172).

Catamount brings this action claiming that Microsoft has infringed on a trade-

---

1. The Court has previously dismissed all claims against defendants Intuit, Inc. and Meca Software, LLC.

2. Specifically, Fed.R.Civ.P. 52(c) provides: "If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law ...."

mark, "PocketMoney," that it uses to market personal finance software for personal digital assistants ("PDAs"). Catamount, a Vermont-based computer software company, first used the "PocketMoney" mark in commerce on June 16, 1994. Aug. 10, 2004 Tr. at 32. Initially, the PocketMoney program only ran on the Apple Newton. *Id.* In 1999, Catamount made PocketMoney available for the Palm Operating System. Aug. 10, 2004 Tr. at 41. Catamount began offering PocketMoney for the Windows CE operating system in 2001. Aug. 12, 2004 Tr. at 11.

Catamount founder Harland Macia named PocketMoney. Macia chose the name after considering options such as "ATM" and "Pocket Change." Aug. 10, 2004 Tr. at 34. When he named Pocket-Money, Macia was aware that Microsoft used the term "Microsoft ® Money" to market personal finance software for desktop and laptop computers. Aug. 10, 2004 Tr. at 35. Macia was also aware that another personal finance application for PDAs was marketed under the name "Pocket Quicken". Aug. 10, 2004 Tr. at 36.

Catamount filed a federal trademark application for "PocketMoney" on February 17, 1998. Pl.'s Ex. 8. This application is still pending before the Patent and Trademark Office. *Id.* Catamount has successfully registered the mark in Switzerland and the European Union. *Id.*

The approximate retail price of Pocket-Money is $30. Aug. 10, 2004 Tr. at 126. In 1999, Catamount's sales of PocketMoney were approximately $24,000. Aug. 10, 2004 Tr. at 192. In 2000, its sales of PocketMoney were approximately $75,000. Aug. 10, 2004 Tr. at 61. In 2001, sales rose dramatically to approximately $260,000. *Id.* This rise in sales coincided with Handmark taking over most of the distribution and marketing of PocketMoney. Handmark took over as the online and retail distributor of the English ver-

sion PocketMoney in late 2000. Aug. 10, 2004 Tr. at 125, 190.

Although Handmark runs most of the marketing and distribution, Catamount retains the right to review and approve any packaging for PocketMoney. Aug. 10, 2004 Tr. at 175. The PocketMoney package at one time displayed the "Pocket" portion of the mark in black and the "Money" portion in red. Catamount asked Handmark to change the display to one color, in part because of Microsoft's use of "Money." Aug. 10, 2004 Tr. at 173–74.

In 1997, Microsoft developed a version of its Windows operating system to run on PDAs, called "Windows CE." Aug. 11, 2004 Tr. at 182–83. As Microsoft adapted some of its desktop and laptop software programs for PDAs, it adopted a naming convention that placed the word "Pocket" before the name of its desktop or laptop software: thus, for example, Microsoft ® Word was called "Pocket Word." Aug. 11, 2004 Tr. at 197; Pl.'s Ex. 19. PDAs that use the Windows CE operating system are generally referred to as "Pocket PCs." Aug. 12, 2004 Tr. at 10–11. Microsoft does not manufacture pocket PCs itself. Aug. 11, 2004 Tr. at 90.

On February 5, 1999, Microsoft informed Catamount that it intended to market personal financial management software to run on Pocket PCs as Microsoft ® Pocket Money. Pl.'s Ex. 19. A series of correspondence followed in which Catamount vehemently opposed this plan and Microsoft maintained its right to use its chosen name. *Id.* Eventually, on May 10, 1999, Microsoft informed Catamount that "for various reasons" it would "pursue a different naming strategy for this product." *Id.* This strategy was to name the new product Microsoft ® Money for Pocket PC. Pl.'s Ex. 20. Catamount informed Microsoft that any attempt to combine the

words "Pocket" and "Money" in a product name would be met by litigation. *Id.*

Microsoft ® Money for Pocket PC was released in 2000. *Id.* It is pre-installed on many Pocket PCs and is available on Microsoft's web site, where consumers can download the software. It is also available as part of the software package for Microsoft ® Money 2003. Microsoft does not charge customers for Microsoft ® Money for Pocket PC. Aug. 12, 2004 Tr. at 64.

Catamount presented some isolated examples of confusion about the marks at issue in this case. Two potential customers appear to have been seeking the Microsoft product when they contacted Catamount. Pl.'s Ex. 22. Catamount also presented some discussion on internet newsgroups that demonstrate confusion about the origins of PocketMoney and Microsoft ® Money for Pocket PC. Pl.'s Ex. 30. Catamount did not present evidence of any customers who declined to purchase PocketMoney because of an erroneous belief that the product was associated with Microsoft. Aug. 11, 2004 Tr. at 38.

Agents of Microsoft and third parties have occasionally referred to Microsoft ® Money for Pocket PC as "Pocket Money". Pl.'s Exs. 22–23, 25–29 and 32. Some of these references appear in locations (such as hidden files) that are unlikely to be viewed by consumers. Aug. 12, 2004 Tr. at 25. Other references have appeared on the web sites of third party retailers. Pl.'s Ex. 25–26. In addition, Microsoft technical support personnel often referred to Microsoft ® Money for Pocket PC as "Pocket Money" in their correspondence with users. Pl.'s Ex. 32.

Catamount began to compete directly with Microsoft ® Money for Pocket PC in 2001 when it released its version of PocketMoney for the Windows CE operating system. Catamount asked Handmark to refer to this version of PocketMoney as "PocketMoney for Pocket PC". Aug. 10, 2004 Tr. at 176. The addition of "for Pocket PC" lets consumers know what device the product is for. Aug. 12, 2004 Tr. at 4–6. In a similar vein, Tom Jaros (the developer of PocketMoney for Pocket PC) named a different program "Seymour for Pocket PC". *Id.*

At trial, Catamount offered a survey conducted by RL Associates that was designed to test whether "PocketMoney" is a descriptive or a suggestive mark. Pl.'s Ex. 10. The survey consisted of 141 interviews of individuals selected at random at five shopping malls around the country. *Id.* RL Associates selected as its universe [3] all individuals aged eighteen or older. Aug. 11, 2004 Tr. at 112–116. Dr. Rappeport of RL Associates testified that he chose to study the universe of all individuals because PDAs were, at that time, a new product with a rapidly expanding market. *Id.* Dr. Rappeport assumed that many individuals could be within the class of potential consumers of PDA products even if they were not currently aware of this. *Id.* The results of the survey suggest that most members of the general public are not familiar with a software product called PocketMoney, and that the public does not understand the name "PocketMoney" as one that describes the product's characteristics. Pl.'s Ex. 10. The survey was not designed as a likelihood of confusion survey. Aug. 11, 2004 Tr. at 154.

### Discussion

■ Catamount claims that Microsoft has caused reverse confusion with Catamount's mark PocketMoney by using Microsoft ® Money for Pocket PC to identify its financial management software for

---

**3.** A survey's "universe" is the relevant population about which the survey is intended to provide information. *See* Reference Manual on Scientific Evidence 239 (2d ed.2000).

PDAs. Reverse confusion is "the misimpression that the junior user is the source of the senior user's goods." *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 490 (2d Cir.1988). In this case, reverse confusion would be the misimpression that Microsoft is the source of Catamount's PocketMoney software. A claim of reverse confusion is actionable under 15 U.S.C.A. § 1125(a)(1)(A) (2003). *Banff*, 841 F.2d at 491; *see also Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 740 (2d Cir.1994); *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir.1991).

Microsoft has presented a number of different theories under which it believes it is entitled to judgment on partial findings. First, Microsoft argues that the mark "PocketMoney" is not entitled to protection. Second, Microsoft argues that there is no likelihood of confusion between the two marks. Microsoft also claims that it cannot be held liable for simply combining its preexisting mark "Microsoft ® Money" with a descriptive phrase such as "for Pocket PC." Finally, Microsoft urges that Catamount is not entitled to monetary relief as it failed to prove any damages stemming from Microsoft's alleged infringement.

The Court finds that Microsoft is entitled to judgment on three of these grounds. First, after weighing the so-called *Polaroid* factors, the Court concludes that there is no likelihood of the reverse confusion alleged by Catamount. *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.1961). Second, the Court agrees that the product name "Microsoft ® Money for Pocket PC" simply combines Microsoft's senior mark, "Microsoft ® Money," with a descriptive phrase. Thus, Microsoft cannot be held liable for trademark infringement on the basis of this name. Finally, the Court agrees that Catamount failed to show any damages resulting from Microsoft's actions.

**A. Entitlement to Protection**

Microsoft argues that "PocketMoney" is not a protectable mark. Although the Court disagrees, discussion of this issue will provide useful background. In particular, it is important to note that although the "PocketMoney" mark, when considered as a whole, is suggestive, it contains descriptive elements. Thus, while the mark is protectable, infringement cannot be based simply on a descriptive use of one of its elements. *See Am. Cyanamid Corp. v. Connaught Labs., Inc.*, 800 F.2d 306, 308 (2d Cir.1986) (noting that trademark law does not prevent "competitors from using generic or descriptive terms to inform the public of the nature of their product").

As PocketMoney is an unregistered mark, Catamount must demonstrate that it merits protection. *Banff*, 841 F.2d at 489. Trademarks fall into four categories, determining the degree of protection afforded them: "these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). A generic term actually defines the product, "and refers to the genus of which the particular product is a species." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir.1999); *see also Abercrombie*, 537 F.2d at 9. A descriptive term "describes the product's features, qualities, or ingredients in ordinary language or describes the use to which the product is put." *Lane Capital Mgmt.*, 192 F.3d at 344. A term is suggestive if it "merely suggests the features of the products, requiring the purchaser to use imagination, thought and perception to reach a conclusion as to the nature of goods." *Id.* A

term is arbitrary if it applies a common word in an unfamiliar way, and fanciful if the word has been invented for its use as a mark. *Id.*

Generic terms are never entitled to trademark protection. *See Abercrombie,* 537 F.2d at 9. A descriptive mark is only entitled to protection if it has "acquired a secondary meaning in its particular market[, so] that the consuming public primarily associates the term with a particular source." *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1040 (2d Cir.1992). A plaintiff need not prove secondary meaning in order to gain trademark protection for a suggestive term. *Id.*

In this case, the question is whether PocketMoney is descriptive or suggestive. PocketMoney is a composite mark, consisting of the words "Pocket" and "Money" joined together. The first element, "Pocket," is descriptive when used of computer hardware as it describes the size of the hardware. Catamount argues that "Pocket" cannot be descriptive of software because software is "intangible" and cannot be placed in a pocket. Aug. 12, 2004 Tr. at 155–56. This argument is misplaced, however. The Court must consider "how the words are used in context rather than their meaning in the abstract." *Bristol–Myers Squibb,* 973 F.2d at 1041; *see also Thompson Med. Co. v. Pfizer Inc.,* 753 F.2d 208, 213 (2d Cir.1985) ("the determination whether a mark is descriptive or suggestive cannot be made in a vacuum; it is necessary to surmise the mental processes of those in marketplace at whom mark is directed"). Evidence at trial suggested that, when used in connection with software, "pocket" is descriptive of software designed to run on "pocket-sized" computers. In fact, when he named PocketMoney, Macia was already aware of software that applied this descriptive use of "pocket." Aug. 10, 2004 Tr. at 188. More-

over, this descriptive use of "pocket" for software has only become more common since that time. Aug. 11, 2004 Tr. at 57–58. Thus, even if "pocket" was merely suggestive for software when Macia first named his product, there is no question that the term is descriptive today. Hundreds, if not thousands, of software products now include a descriptive use of the word "pocket" in their name. *Id.*

"Money" lies close to the border between suggestive and descriptive when applied to consumer software. Although it does not immediately convey an idea about the product's characteristics, it is not difficult to conclude that the product might be financial management software. Nevertheless, even though "Pocket" is descriptive and "Money" may also be descriptive, Catamount's composite mark may be worthy of protection as suggestive. Marks are considered as wholes and the consolidation of two descriptive terms may result in a composite mark that is suggestive. *See, e.g., W.W.W. Pharm. Co. v. Gillette Co.,* 808 F.Supp. 1013, 1022 (S.D.N.Y.1992) (consolidation of two descriptive or generic terms, "sport" and "stick," suggested both product's form and usage, but required some imagination to surmise nature of product, and thus was suggestive mark), *aff'd,* 984 F.2d 567 (2d Cir.1993); *see also Banff,* 841 F.2d at 489 (combination of arbitrary and generic terms in mark "Bee Wear" resulted in suggestive or arbitrary mark). "Pocket money" is used to refer to both money carried in a pocket for occasional expenses and a child's allowance. These senses of the composite term are not descriptive of Catamount's product.

The survey conducted by RL Associates also provides some support for the conclusion that "PocketMoney" is suggestive. The survey does not provide strong evidence because it sampled the views of the general public rather than those known to

be likely to purchase software for PDAs. *See Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694, 699 (2d Cir. 1961) (critical question is whether mark is descriptive to prospective purchasers, not general public). Nevertheless, Dr. Rappeport, an experienced statistician, testified that a survey of the general public would provide useful information about how prospective purchasers would perceive the mark. Aug. 11, 2004 Tr. at 112–116. Also, the small subset of those survey participants who owned PDAs gave similar responses to the other subjects. Pl.'s Ex. 10. Thus, the survey provides a small amount of additional evidence that Catamount's mark is suggestive.

Considering only the Plaintiff's evidence, Microsoft is not entitled to judgment on the ground that Catamount has no protectable rights in its mark. This does not mean that the Court might not have reached a different conclusion after hearing all of the evidence. At this stage of the trial, however, the Court finds that "PocketMoney" is a suggestive mark even though it contains descriptive elements.

**B. "Pocket PC" is a Generic Term and "for Pocket PC" is a Descriptive Phrase**

■ It will be helpful to address the status of the term "Pocket PC" and the phrase "for Pocket PC" before discussing Microsoft's other grounds for judgment. Whether a term is descriptive or generic is a fact-bound determination that depends on how prospective buyers understand the term. *See DuPont Cellophane Co. v. Waxed Prods. Co.*, 85 F.2d 75, 81 (2d Cir.1936) (A.Hand, J.) (quoting *Bayer Co. v. United Drug Co.*, 272 F. 505, 509 (S.D.N.Y.1921) (L.Hand, J.)); *see also Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 144–45 (2d Cir.1997) (consumer understanding will determine extent to which term communicates functional characteristics and significance of

term's doing so). The Court was unable to make such fact-bound determinations at summary judgment. Order at 2–3 (Doc. 178) (denying Microsoft's motion for reconsideration).

■ Having heard Catamount's evidence at trial, the Court finds that "Pocket PC" is a generic term. Jaros testified that "Pocket PC" refers to a hand-held computer that runs a Windows CE operating system. Aug. 12, 2004 Tr. at 10–11. Thus, "Pocket PC" is essentially a name for a type of product and is a generic term.

■ Catamount argues that "Pocket PC" cannot be generic because it has become a trademark of Microsoft. Catamount's Mid–Trial Mem. of Law at 7–8 (Doc 240). This claim is untenable. First, "Pocket PC" refers to hardware and Microsoft does not even produce hardware. Second, Pocket PCs are produced by many different manufacturers so "Pocket PC" cannot be an indicator of a single source. The fact that a term refers to a wide variety of sources is evidence that it is generic. *See, e.g., Pilates, Inc. v. Current Concepts, Inc.*, 120 F.Supp.2d 286, 301 (S.D.N.Y.2000). There was some evidence that Microsoft asks its own Original Equipment Manufacturers ("OEMs") to use the term "Pocket PC" in specific ways when describing products. Pl.'s Ex. 24. This is very different from Microsoft claiming that term as a trademark, however. There was no evidence that Microsoft attempts to control how the term is used by parties other than its own staff or its OEMs. Thus, Catamount presented no evidence that Microsoft actually claims (or could claim) intellectual property rights in the term "Pocket PC."

■ Catamount also argues that "Pocket PC" cannot be generic because it is descriptive of a species of computer. Catamount's Mid–Trial Mem. of Law at 6

(Doc 240). This argument is based on a misunderstanding of both trademark law and language. First, it is well settled that a term designating a sub-species can itself be a generic term. *See Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.,* 175 F.3d 266, 271 (2d Cir.1999) (collecting cases). This is simply common sense. For example, "cheddar" refers to a species of the genus cheese but is obviously a generic term. Second, generic terms, like all names, can have descriptive elements. This is a fundamental principle of language. Even place names can have descriptive components. For example, one doesn't have to be a geography expert to guess that Portsmouth in New Hampshire is at the mouth of a river and contains a port. Similarly, "box-cutter" is a generic term for a kind of tool even though it is descriptive of one of the potential uses of this tool. In fact, generic terms are sometimes referred to as "descriptive names." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985) ("Marks that constitute a common descriptive name are referred to as generic.") Thus, the term "Pocket PC" can be generic even though it refers to a sub-species of computer hardware and has a descriptive element. Catamount's own evidence strongly supports the view that "Pocket PC" is a generic name used to refer to a type of product. Aug. 12, 2004 Tr. at 10–11.

Having found that "Pocket PC" is a generic term it is easy to determine that "for Pocket PC" is a descriptive phrase. Producers of software use the phrase to inform customers about what hardware the software runs on. Aug. 10, 2004 Tr. at 176; Aug. 12, 2004 Tr. at 75. Catamount's own evidence makes this clear. Jaros testified that he named a product "Seymour for Pocket PC" so that customers would know what kind of platform it ran on. Aug. 12, 2004 Tr. at 75. This is clearly a descriptive use of the phrase as it provides customers with information about the potential uses of the product.

### C. Likelihood of Confusion

Catamount must establish that "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Banff,* 841 F.2d at 489 (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978) (per curiam)). As Catamount has pleaded reverse confusion, Catamount must establish that an appreciable number of consumers will form the misimpression that Microsoft is the source of Catamount's product. *See id.* at 490.

■ The Court evaluates the marks in light of the *Polaroid* factors. *See Polaroid,* 287 F.2d at 495. These factors include, but are not limited to: the strength of the mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap and enter the defendant's market, actual confusion, the defendant's good faith in adopting its own mark, the quality of the defendant's product, and the sophistication of the buyers. *Id.; see also Banff,* 841 F.2d at 489–90. The *Polaroid* factors are not exclusive and should not be applied mechanically; the weight accorded to each factor may vary depending on the facts of each case. *See Arrow Fastener Co., Inc. v. Stanley Works,* 59 F.3d 384, 400 (2d Cir.1995).

### 1. Strength of the Mark

■ The Court has previously noted that a senior user's relative lack of commercial strength should be accorded less weight in a reverse confusion case. Op. & Order at 15 n. 8 (Doc. 172). This is because "in a reverse confusion case, the junior user is not trying to take a free ride on the recognition value of a strong, senior mark." McCarthy on Trademarks and

Unfair Competition § 23:10 (4th ed.2004); *see also Sunenblick v. Harrell*, 895 F.Supp. 616, 627–28 (S.D.N.Y.1995), *aff'd*, 101 F.3d 684 (2d Cir.1996) (unpublished table decision), *cert. denied*, 519 U.S. 964, 117 S.Ct. 386, 136 L.Ed.2d 303 (1996). Courts must take care to apply the *Polaroid* factors to the specific facts of each case. *See Arrow Fastener*, 59 F.3d at 400. Here, Catamount is not suggesting that Microsoft is trying to free ride on the strength of the senior mark. Thus, the Court concludes that the strength of Catamount's mark is a factor that should be accorded little or no weight in this case.

## 2. Degree of Similarity

At summary judgment, the Court held that a trier of fact *could* conclude that the similarity of the marks was a factor favoring Catamount. As the final trier of fact, however, the Court reaches a very different conclusion. Catamount's evidence established that "Pocket PC" is a generic term and that "for Pocket PC" is a descriptive phrase. This means that Microsoft's mark, "Microsoft ® Money for Pocket PC," should be analyzed as having two parts. The first part, "Microsoft ® Money," is the name of the product. The second part, "for Pocket PC," specifies which device the product is for. This suggests that consumers will focus on the first part of the mark as being the true product name and identifier of origin.

This is illustrated by Catamount's own use of "for Pocket PC" as a descriptive phrase. The Windows CE version of PocketMoney is named "PocketMoney for Pocket PC." Aug. 10, 2004 Tr. at 176. When Catamount releases a version of PocketMoney for Smartphone it will be named "PocketMoney for Smartphone." Aug. 12, 2004 Tr. at 6. Both of these names are like Microsoft's mark in that they contain a product name and a descriptive phrase. In each case, consumers are likely to focus only on the first part of the

mark as this is what actually identifies the product and its source.

This is not to deny that marks must be considered as wholes. *See Banff*, 841 F.2d at 491. Even when a mark contains a descriptive or generic element, courts must look at the composite mark for the purposes of assessing similarity. *See id.* Nevertheless, this does not mean that courts should ignore the fact that a mark includes a generic term or descriptive phrase. This may still be relevant to how consumers are likely to perceive the mark. Courts should "look at the general impression created by the marks, keeping in mind all factors which the buying public will likely perceive and remember." *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir.1993). In this case, the fact the second part of Microsoft's mark is a descriptive phrase means that consumers are likely to focus on the first part of the mark as the designation of origin. This strongly reduces the probability that consumers will confuse the marks simply because both contain the words "pocket" and "money."

The prominent display of Microsoft's famous house mark also reduces the likelihood of consumer confusion. Courts have often concluded that the display of a house mark reduces the risk of confusion. *See Nabisco, Inc. v. Warner–Lambert, Co.*, 220 F.3d 43, 46–47 (2d Cir.2000) (collecting cases). Here, the house mark "Microsoft" is the first element of the product name itself. This significantly reduces the likelihood that consumers will conclude that "PocketMoney" and "Microsoft ® Money for Pocket PC" come from the same source. For these reasons, the court finds that this important factor favors Microsoft.

## 3. Proximity of the Products and Bridging the Gap

These factors consider how closely the two products compete with each other and

if they are likely to come into closer competition. *Lang,* 949 F.2d at 582. If the two products are not competitors then confusion is less likely. In this case, it is clear the products serve the same purpose and directly compete with each other. As the products compete directly there is no 'gap' to be bridged. These factors favor Catamount.

### 4. Actual Confusion

As this is a reverse confusion case, Catamount must show that consumers are likely to think that Microsoft is the source of Catamount's PocketMoney software. *See Banff,* 841 F.2d at 490. Moreover, this confusion must be the kind of confusion that "affects 'the purchasing and selling of the goods or services in question.'" *Lang,* 949 F.2d at 583 (quoting *Programmed Tax Sys., Inc. v. Raytheon Co.,* 439 F.Supp. 1128, 1132 (S.D.N.Y.1977)). At trial, Catamount added very little new evidence of actual confusion. Thus, Catamount's evidence of actual confusion was discussed in the Court's summary judgment order. *See* Op. & Order at 18–20 (Doc. 172). There is no need to repeat that discussion. The Court again concludes that this handful of anecdotes of consumer confusion should be considered "de minimis evidence." *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 269 F.3d 114, 124 (2d Cir.2001).

Moreover, Catamount's evidence from online discussions does not demonstrate confusion involving potential consumers of its product who mistakenly believed that it was produced by Microsoft. Similarly, evidence that agents of Microsoft have occasionally referred to their product as "Pocket Money" does not establish that consumers have mistakenly concluded that Catamount's product is associated with Microsoft. In fact, Macia conceded that he did not know of *any* instances in which a consumer had declined to purchase PocketMoney because of a mistaken belief that

the product was associated with Microsoft. Aug. 11, 2004 Tr. at 38–39. Thus, the Court saw no evidence of actual confusion that would support Catamount's reverse confusion claim. The errors demonstrated by the evidence do not permit the inference that Catamount will suffer "commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation." *Lang,* 949 F.2d at 583. This factor favors Microsoft.

### 5. Good Faith

Although Catamount has strongly urged the conclusion that Microsoft acted in bad faith, the evidence presented at trial does not support this view. Generally, bad faith is established by proof that "'the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his [sic] and the senior user's product.'" *Lang,* 949 F.2d at 583 (quoting *Edison Bros. Stores, Inc. v. Cosmair, Inc.,* 651 F.Supp. 1547, 1560 (S.D.N.Y.1987)). Catamount presented no evidence showing that Microsoft intended to capitalize on Catamount's reputation or good will.

Ordinarily, a finding that Microsoft did not attempt to appropriate Catamount's good will would end the bad faith inquiry. In a reverse confusion case, however, the junior user is unlikely to be trying to capitalize on the good will of the senior user. *See* McCarthy on Trademarks and Unfair Competition § 23:10 (4th ed.2004). Thus, bad faith is more likely to be based on a decision to use a mark knowing that the mark will cause consumer confusion. This was the situation in *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 408 F.Supp. 1219 (1976), *aff'd as modified,* 561 F.2d 1365 (10th Cir.1977). In *Big O,* the Court found adequate evidence of bad faith where Goodyear knowingly adopted a mark identical to that of a direct competi-

tor. *See Big O,* 408 F.Supp. at 1233 (noting that Goodyear "proceeded with an intentional and deliberate infringement of plaintiff's trademark" and that this was a "wanton and reckless disregard of the rights of the plaintiff").

Catamount has repeatedly argued that the facts in *Big O* are directly analogous to the facts of this case. This is not correct. In *Big O,* the defendant used an identical mark knowing it would cause confusion. Here, Catamount's own evidence shows that Microsoft considered using an identical (or nearly identical) mark but decided against it. Pl.'s Ex. 19–20. This is very different from the *Big O* case where the defendant pressed ahead with its initial plan despite knowing that it would cause confusion. There is no reason to conclude that Microsoft did not have a good faith belief that it was entitled to use the mark it finally chose. Thus, this factor weighs in favor of Microsoft.

Catamount cites *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254 (2d Cir.1987) for the proposition that the defendant's knowledge of plaintiff's trademark rights gives rise to a presumption that the defendant intended to infringe. Catamount's Mid–Trial Mem. of Law at 11 (Doc 240). A moment's thought is sufficient to realize that this cannot be a correct statement of the law. Obviously, a defendant can only be presumed to have acted in bad faith if it knowingly adopted a *confusingly similar* mark. Indeed, this is the holding of *Mobil Oil. See* 818 F.2d at 259; *see also Paddington Corp. v. Attiki Imp. & Distrib., Inc.,* 996 F.2d 577, 587 (2d Cir.1993); *W.W.W. Pharm.,* 808 F.Supp. at 1024. Here, the marks are not so similar that an inference of bad faith automatically arises from Microsoft's prior knowledge of Catamount's mark.

### 6. Quality of the Product

Tom Jaros, the developer of PocketMoney for Pocket PC, testified that Microsoft's product was inferior. Aug. 12, 2004 Tr. at 26–27. He testified that PocketMoney has a number of useful features that are not available in Microsoft ® Money for Pocket PC. *Id.* Catamount also presented evidence suggesting that Microsoft's product has a poor reputation. Pl.'s Ex. 30. However, this hearsay evidence was not admissible to prove the truth of the matter regarding the quality of Microsoft's product. Finally, there was evidence showing that both products had the usual assortment of bugs and glitches associated with new programs. Aug. 10, 2004 Tr. at 201–02. Catamount offered no expert or third party testimony on the quality of the products. Overall, the evidence did not establish a wide disparity in quality between the products. At best, this factor weakly favors Catamount.

### 7. Sophistication of the Buyers

Catamount did not present evidence directly addressing the issue of sophistication of the buyers. Generally, sophisticated consumers are thought less likely to be confused by similar marks. *Bristol–Myers Squibb,* 973 F.2d at 1046. Moreover, financial management software appears to be the kind of product that would appeal to sophisticated consumers. *See M & G Elecs. Sales Corp. v. Sony Kabushiki Kaisha,* 250 F.Supp.2d 91, 104 (E.D.N.Y.2003) (finding electronic products consumers sophisticated); *Nat'l Info. Corp. v. Kiplinger Wash. Editors, Inc.,* 771 F.Supp. 460, 465 (D.D.C.1991) (purchasers of financial publications likely to exercise care); *Lambda Elecs. Corp. v. Lambda Tech., Inc.,* 515 F.Supp. 915, 928 (S.D.N.Y.1981) (finding computer software package purchasers sophisticated). Nevertheless, as no evidence was presented on this issue, the Court will not consider this factor as favoring either party.

Overall, it is clear that the *Polaroid* factors require judgment for Microsoft. The only factors favoring Catamount involve the proximity and quality of the products. Obviously, Catamount cannot prevail under the Lanham Act simply because it produces a superior product that directly competes with Microsoft's product. The more important factors of similarity of the marks and actual confusion support Microsoft. The evidence suggests that Microsoft's mark has only caused a de minimis amount of actual confusion and, given the dissimilarity between the marks, is unlikely to cause much confusion in the future. As Catamount failed to establish likelihood of confusion at trial, Microsoft is entitled to judgment on Catamount's Lanham Act claim.

### D. Microsoft's Mark Combines a Pre-existing Mark with a Descriptive Phrase

Microsoft argues that it cannot be held liable for infringement based on a mark that simply combines a prior mark with a descriptive phrase. Microsoft's use of Microsoft ® Money predates Catamount's use of PocketMoney. The evidence at trial established that "for Pocket PC" is a descriptive phrase. Thus, Microsoft is correct that its mark is a combination of a prior mark and a descriptive phrase.

■ The rule in the Second Circuit is that a finding of infringement cannot rest solely on the use of a generic or descriptive term. *See Banff*, 841 F.2d at 492. This rule was established in *Am. Cyanamid Corp. v. Connaught Labs., Inc.*, 800 F.2d 306 (2d Cir.1986). In *Connaught*, the court found that the term "HIB" was a generic term for a type of influenza. *Id.* at 308. The court concluded that there could be no trademark infringement where the non-generic elements of the competing marks were totally different. *See id.*

■ This case is not identical to *Connaught*. This is because the non-descriptive portion of Microsoft's mark ("Microsoft ® Money") is similar to an element of Catamount's mark. Thus, Catamount is not claiming that Microsoft's infringement is based solely on the use of the generic term "Pocket PC" or the descriptive phrase "for Pocket PC." Nevertheless, Microsoft is still entitled to judgment. This is because the Microsoft's use of this non-descriptive element predates Catamount's mark. Thus, Microsoft is entitled to use "Microsoft ® Money" as part of the product name for the Pocket PC version of its software.

Catamount has disputed that Microsoft ® Money for Pocket PC is a version of Microsoft Money. In support of this contention, Catamount offered evidence that the two products differ in functionality and layout. Aug. 12, 2004 Tr. at 18–19. Nevertheless, Catamount does not dispute that both Microsoft ® Money for Pocket PC and Microsoft ® Money are personal finance applications. Thus, it is reasonable to consider the new product a "version" of Microsoft ® Money. This means that Microsoft is entitled to use both of the elements of its product name. The first element, "Microsoft ® Money," is a senior mark. The second element, "for Pocket PC," is merely a descriptive phrase. The Lanham Act does not prohibit companies from describing the functionality of their products. A competitor should not "be permitted to impoverish the language of commerce by preventing his fellows from fairly describing their own goods." *Bada Co. v. Montgomery Ward & Co.*, 426 F.2d 8, 11 (9th Cir.1970), *cert. denied*, 400 U.S. 916, 91 S.Ct. 174, 27 L.Ed.2d 155 (1970). Thus, even if the Court had found a likelihood of confusion, Microsoft would not be liable under the Lanham Act because this would punish Microsoft for using a senior mark in combination with a useful descriptive phrase.

### E. Catamount Failed to Establish that it had Suffered Damages

 Catamount seeks $135,300,000.00 in damages. This astonishing claim is made even more remarkable by the fact that Catamount failed to present any evidence that it had suffered damages as a result of Microsoft's actions. Second Circuit law is clear that damages are available "only to the extent that injury is shown already to have been suffered." *W.W.W. Pharm.*, 808 F.Supp. at 1020 (citing *Monsanto Chem. Co. v. Perfect Fit Prods. Mfg. Co.*, 349 F.2d 389, 392 (2d Cir.1965), *cert. denied*, 383 U.S. 942, 86 S.Ct. 1195, 16 L.Ed.2d 206 (1966)). This rule applies in both forward and reverse confusion cases. *See id.* Thus, even if Catamount had established a likelihood of confusion, it would not be entitled to a monetary award. Catamount's extravagant damages claim is itself a good reminder of why courts must restrict themselves to damages calculations that are not based on speculation.

Catamount was unable to demonstrate any harm to its business. Aug. 12, 2004 Tr. at 149. In fact, Catamount's sales rose dramatically after Microsoft released its competing product. Aug. 10, 2004 Tr. at 61, 192. Catamount argues that its use of Handmark's distribution network plus the increasing size of the PDA market explain this increase. Aug. 11, 2004 Tr. at 100. Catamount claims that its sales would have risen even more dramatically if Microsoft had chosen a different name for its product. Although this is a possibility, Catamount conceded that the claim is entirely speculative. Aug. 12, 2004 Tr. at 149.

The Court acknowledges that the requirement that the plaintiff show that it has suffered harm does not necessitate that the plaintiff prove an exact amount of damage. The Supreme Court has recognized that harm may be difficult to quantify and this should not always bar recovery.

*See Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946). Nevertheless, a plaintiff must present *some* evidence from which the fact finder can render a verdict that is not based on "speculation and guesswork." *Id.; see also Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927) ("[d]amages are not rendered uncertain because they cannot be calculated with absolute exactness," but there must be a "reasonable basis of computation"). This is a fundamental principle of law.

Catamount argues that *Big O Tire Dealers, Inc. v. Goodyear Tire and Rubber Co.*, 561 F.2d 1365 (10th Cir.1977) provides the Court with a reasonable method of computing damages. This method is to award one quarter of the defendant's advertising expenses. *See Big O*, 561 F.2d at 1374–76. Such a damage award would allow Catamount to engage in a corrective advertising campaign to remedy confusion caused by Microsoft's mark. *See id.* There are important differences between the facts of *Big O* and the facts of this case. Unlike *Big O*, this case does not involve identical marks and does not involve bad faith from the defendant. Thus, *Big O* may not provide a useful measure of damages for this case. *See A & H Sportswear Co., Inc. v. Victoria's Secret Stores*, 967 F.Supp. 1457, 1478–79 (E.D.Pa.1997) (declining to apply *Big O* where there was no showing of bad faith and defendant had not used a mark identical to that of the plaintiff). Also, not all courts have accepted that *Big O* provides a non-speculative method of computing damages. *See Trovan, Ltd. v. Pfizer, Inc.*, CV–98–00094, 2000 WL 709149 at *12 n. 16 (C.D.Cal. May 24, 2000) (holding that evidence of defendant's advertising expenses, taken alone, does not provide a non-speculative measure of damages).

Regardless, as the Court has not found a likelihood of confusion, corrective advertis-

ing is not warranted here. Moreover, even if confusion had been demonstrated, Catamount did not present any evidence establishing Microsoft's advertising expenses for Microsoft ® Money for Pocket PC (Microsoft claims that this is because there were no such expenses). Thus, the Court was provided with no reasonable means to calculate the cost of a corrective advertising campaign.

Catamount suggests that the Court should consider more than the advertising expenses for Microsoft ® Money for Pocket PC. In arriving at its enormous damages claim, Catamount suggests that the Court should look to all of Microsoft's expenditures promoting Microsoft ® Money and its spending promoting all of its Pocket PC software. This remarkable claim is without merit. Microsoft's expenditures promoting its senior mark "Microsoft ® Money" and other products unrelated to the case at hand cannot provide a basis for Catamount's damages. Overall, Catamount presented no evidence justifying an award of damages.

### F. State Law Claims

■ Microsoft is entitled to judgment on Catamount's state law claims of trademark infringement, trademark appropriation, and unfair competition, because success on these claims also rests on likelihood of confusion. *See Vt. Motor Co. v. Monk*, 116 Vt. 309, 312, 75 A.2d 671, 673 (Vt.1950) (holding that trademark appropriation and unfair competition require a likelihood of confusion); *see also Maguire v. Gorruso*, 174 Vt. 1, 3 n. 1, 800 A.2d 1085, 1088 n. 1 (2002) (noting that the common law of trademark infringement has been "federalized" although not preempted by the Lanham Act). Although there is no Vermont case law establishing a cause of action for trademark disparagement, cases recognizing this cause of action require that a likelihood of confusion be demon-

strated to sustain such a claim. *See, e.g., Big O*, 408 F.Supp. at 1248. Thus, having failed to establish a likelihood of confusion, Catamount cannot prevail on its state law claims.

### *Conclusion*

For the foregoing reasons, Microsoft's Motion for Judgment on Partial Findings is granted and the Court finds for Microsoft on all of the remaining counts of Catamount's Second Amended Complaint. Microsoft's counterclaim in this action was pleaded in the alternative and only arises if a likelihood of confusion is found. Thus, Microsoft's counterclaim is dismissed as moot.

CASE CLOSED.